**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| CARRIE LUCILLE WILLIAMS, ) | CASE NO.    3:13CV1276 |
| Plaintiff, ) | |
| ) | JUDGE JACK ZOUHARY |
| v. ) | |
| ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social ) | **REPORT & RECOMMENDATION** |
| Security ) | |
| ) | |
| Defendant. ) | |

Plaintiff Carrie Lucille Williams ("Williams") challenges the final decision of the Acting

Commissioner of Social Security, Carolyn W. Colvin ("Acting Commissioner"), denying her

claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

("Act"), 42 U.S.C. §§ 1381 *et seq.*  This matter is before the Court pursuant to 42 U.S.C. §

405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the

Commissioner be AFFIRMED.

## I.  Procedural History

On September 8, 2010, Williams filed an application for SSI alleging a disability onset

date of January 1, 2003 and claiming she was disabled due to possible chronic mastoiditis and

severe migraines.  (Tr.  10, 125-31, 141.)  Her application was denied both initially and upon

reconsideration.  (Tr. 84-86, 91-93.)

On April 30, 2012, an Administrative Law Judge ("ALJ") held a hearing during which

Williams, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 27-

56.)  On May 8, 2012, the ALJ found Williams was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 10-19.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-5.)

## II.  Evidence

### Personal and Vocational Evidence

Age twenty-nine (29) at the time of her administrative hearing, Williams is a "younger" person under social security regulations.  *See* 20 C.F.R. § 416.963 (c).  (Tr. 32.)  Williams has an eighth grade education and no past relevant work.  (Tr. 17, 34.)

### Medical Evidence

In March 2006, Williams presented to Suzanne Schuler, M.D., with complaints of recurrent headaches and "daily swelling of the right upper eyelid to the point where she cannot open her eye."  (Tr. 211.)  Dr. Schuler referred her to a ophthalmologist.  *Id.*  Williams returned to Dr. Schuler in January 2008, and reported the ophthalmologist had referred her to a neurologist.  (Tr. 209.)  Williams stated this unidentified neurologist had prescribed Verapamil and Imitrex for her cluster headaches, but it "did not help."  *Id.*  She reported experiencing headaches three times a week with right eye swelling and drainage from her right ear.  *Id.*  On examination, Dr. Schuler noted "slight swelling" over Williams' right eyelid.  *Id.*  She diagnosed headaches; right eyelid swelling; and, ordered an MRI of Williams' brain.  *Id.*

Williams underwent the MRI on January 18, 2008.  (Tr. 225.)  It showed "evidence of abnormal signal in the mastoid air cells consistent with chronic mastoiditis."  *Id.*  On February 5, 2008, Williams presented to Dr. Schuler and reported continued daily headaches and drainage from her right ear.  (Tr. 208.)  Dr. Schuler diagnosed chronic mastoiditis and referred Williams to an ENT.  (Tr. 208.)

On July 23, 2008, Williams presented to neurologist Blake Kellum, M.D., for an initial evaluation.  (Tr. 199-200.)  Williams reported a four year history of headaches located around the right side of her face and behind her eye.  (Tr. 199.)  She described her headaches as sharp and throbbing and rated them a 10 on a scale of 10 in severity.  *Id.*  She also reported nausea, vomiting, photophobia, and sonophobia.  *Id.*  She claimed she had "virtually . . . no period of

2

time in the past four years of being headache free." *Id.* Dr. Kellum found her history was "somewhat similar but not quite characteristic for cluster headaches." (Tr. 200.) He prescribed Indocin and ordered blood work. *Id.*

Williams presented to Dr. Kellum again on September 11, 2008. (Tr. 198.) At this time, she reported the Indocin had not helped. *Id.* Dr. Kellum noted the MRI had shown evidence of chronic mastoiditis, and prescribed a trial of Neurontin. *Id.* The following month, Williams reported "slight improvement" on Neurontin. (T.r 197.) Dr. Kellum increased her dosage. *Id.*

Meanwhile, at some point in 2008, it appears Williams had bilateral tympanostomy tubes placed in her ears by an ENT identified as Dr. Frank. (Tr. 205.) On November 12, 2008, Williams presented to Dr. Schuler and reported she did not believe the tubes had "made any difference in her headaches." *Id.* Dr. Schuler's treatment notes also state "[t]he neurologist discontinued her Neurontin and plans to start another medication today because it was not effective." *Id.*

Williams next visited Dr. Kellum on December 18, 2008. (Tr. 196.) Dr. Kellum noted Williams had responded to Nortriptyline 10 mg, "although [she] has had a volley of headaches over the past week." *Id.* He doubled her Nortriptyline dosage and recommended she return for a follow up in three months. *Id.* The record reflects Williams returned to Dr. Kellum in March, April, and December 2009. (Tr. 193-195.) At each of these visits, Dr. Kellum reported she had "responded to" or was doing "pretty well" while taking Nortriptyline. (Tr. 193-195.) It appears Dr. Kellum gradually increased Williams' dosage during this time period. By December 29, 2009, the record indicates Williams was taking Nortriptyline at the 200 mg dosage, up from 20 mg the year before. (Tr. 193, 196.)

On February 26, 2010, Williams reported to Dr. Kellum that "[s]he has had no headaches since I saw her last." (Tr. 192.) By this point, it appears Dr. Kellum had reduced her dosage of Nortriptyline to 100 mg. *Id.* He also noted Williams had a pea-sized nodule on her right scalp area that had increased in size over the past six months. *Id.* Dr. Kellum recommended she follow-up with Dr. Schuler. *Id.*

Williams presented to Dr. Schuler on June 10, 2010. (Tr. 204.) She reported that she

3

"continues to get headaches" and asked Dr. Schuler whether the nodule on her scalp could be causing them. *Id.* Dr. Schuler concluded the nodule was a "probable cyst" and recommended Williams consult a surgeon. *Id.* Williams indicated she was not interested in surgery "at this point." *Id.*

On July 2, 2010, Williams presented to Dr. Kellum and reported worsening headaches. (Tr. 230.) She stated she was having four headaches a day and indicated "[s]he has been off of Nortriptyline and has really noticed no change from being on medication." *Id.* Dr. Kellum prescribed a trial of Topirimate. *Id.* Four days later, on July 6, 2010, Williams presented to Dr. Schuler for follow-up on unrelated lab work. (Tr. 203.) Dr. Schuler noted Williams had "no complaints" and was "in no acute distress." *Id.* There is no mention of headaches in Dr. Schuler's treatment notes from this visit. *Id.*

Williams returned to Dr. Kellum on October 7, 2010. (Tr. 254.) She reported headaches three to four times a day. *Id.* Dr. Kellum noted Williams "seems to do fairly well" with Topamax,[1] but that she had been having difficulty getting her prescription filled "because of financial constraints." *Id.* He also prescribed Prenilin. *Id.* Williams' last visit to Dr. Kellum occurred on November 16, 2010. (Tr. 229.) At this time, she reported continued headaches but some improvement on Topamax. *Id.* Dr. Kellum increased her Topamax dosage, and noted that Williams also was taking Phrenilin and Trazodone. *Id.*

On February 1, 2011, Dr. Kellum completed a Headache RFC Questionnaire. (Tr. 249-253.) He indicated a diagnosis of migraines and described Williams' prognosis as "guarded to poor." (Tr. 249.) Dr. Kellum stated Williams experienced frequent, daily, severe headaches that lasted from 12 to 24 hours and were triggered by bright lights and stress. (Tr. 249-251.) He also noted Williams' headaches were accompanied by nausea/vomiting, mood changes, and photosensitivity. (Tr. 249-250.) Dr. Kellum indicated Williams would be precluded from performing basic work activities while she was having a headache and, further, that she would

---

[1] It appears that, at some point after Williams' July 2010 visit, Dr. Kellum switched her medication from Topirimate to Topamax. The parties do not direct the Court's attention to any treatment notes or other medical records documenting when or why this change occurred.

4

need one day to recover from a headache before being able to resume her previous activities.
(Tr. 250, 252.)  He offered the following opinions regarding Williams' ability to function in a
competitive work setting:

- She is "capable of low stress jobs" (Tr. 250);

- Her symptoms will interfere with her capacity for competitive employment on an
  eight hour per day, five day per week basis "to the extent that [she] is unable to
  maintain persistence and pace" (Tr. 252);

- She is not capable of functioning on a part-time basis in a competitive work
  setting (Tr. 252);

- She would miss four or more days of work per month due to symptoms related to
  her impairments (Tr. 253);

- She would require unscheduled breaks or rest periods in addition to the standard
  two breaks and lunch break (Tr. 253).

(Tr. 250-253.)  Dr. Kellum also opined Williams was markedly impaired in her ability to
perform activities of daily living. (Tr. 252.)

Williams returned to Dr. Schuler on July 18, 2011.  (Tr. 255-257.)  Williams indicated
she was no longer being treated by Dr. Kellum and stated "her last visit [with him] was turned
over to collection because of some problem with her medical card." (Tr. 255.)  She reported she
had not been taking any medication and that "none of the medication ever helped anyway."  *Id*.
Williams reported headaches five to six times daily and indicated experiencing "lump and
swelling of the right eye."  *Id*.  She also stated that she "feels depressed a lot."  *Id*.  Dr. Schuler
assessed depressive disorder, headache, and tobacco abuse.  (Tr. 256.)  She prescribed
Citalopram and appears to have referred Williams to a neurologist. (Tr. 257, 259.)

**State Agency Opinions**

On November 18, 2010, Don McIntire, Ph.D., conducted a psychological consultative
examination.  (Tr. 231- 236.)  He observed Williams presented with mild depression and was
slightly tearful during the examination.  (Tr. 233.)  Dr. McIntire recounted Williams' history of
headaches and noted she had swelling by her right eyelid.  *Id*.  He found Williams had no
difficulties with long-term memory, but observed "her short term memory and concentration are
reported to be poor" as she "often forgets what she has intended on doing and forgets to finish

5

tasks that she has started." (Tr. 234.)  He concluded she "appeared to be functioning intellectually within the borderline range."  *Id.*

Dr. McIntire assessed dysthymic disorder; panic disorder with agoraphobia; and, migraine headaches and mastoiditis.  (Tr. 235.)  He assigned Williams a Global Assessment of Functioning ("GAF") score of 54.[2]  *Id.*  With regard to Williams' mental abilities, Dr. McIntire found her ability to understand, remember and follow lengthy, detailed, or complicated instructions was mildly impaired.  *Id.*  Her ability to understand, remember, and follow simple, one or two step instructions was unimpaired, however, "as she had no difficulties with simple instructions during the examination."  *Id.*  In addition, Dr. McIntire determined Williams was markedly impaired in her abilities to (1) work around others; (2) maintain attention and concentration to perform tasks; and, (3) manage the emotional stress of everyday work life.  (Tr. 236.)

On December 6, 2010, Carl Tishler, Ph.D., reviewed Williams' records and completed a Mental RFC Assessment.  (Tr. 63-65.)  He concluded Williams' ability to understand and remember "very short and simple instructions" was not significantly impaired, but her ability to understand and remember detailed instructions was moderately limited.  (Tr. 64.)  Dr. Tishler also found that Williams was moderately limited in her abilities to: (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or in proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and

---

[2]  The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Association, 4th ed revised, 2000) ("DSM-IV").  An individual's GAF is rated between 0 - 100, with lower numbers indicating more severe mental impairments. A GAF score between 51 - 60 denotes "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)."  DSM-IV at 34.  It bears noting that a recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Association, 5th ed., 2013).

6

to perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticisms from supervisors; and, (7) respond appropriately to changes in the work setting. (Tr. 64-65.)

Cynthia Waggoner, Ph.D., reviewed Williams' records and completed a Mental RFC Assessment on March 29, 2011.  (Tr. 77-79.)   She reached the same conclusions as Dr. Tishler regarding Williams' moderate limitations. (Tr. 77-79.)

Finally, on March 27, 2011, Khozema Rajkotwala, M.D., conducted a consultative examination of Williams and completed a report regarding her physical limitations.  (Tr. 237-242.)  Dr. Rajkotwala noted that Williams complained of headaches on a daily basis associated with nausea and aura.  (Tr. 238.)  She determined Williams presented with migraines and cluster headaches.  (Tr. 239.)  Her physical examination was normal.  (Tr. 238-239.)  With regard to Williams' work abilities, Dr. Rajkotwala determined Williams could "sit, stand, and walk with no difficulty. Lift and carry 20-25 lbs. frequently and 25-30 lbs. occasionally." (Tr. 239.)

***Hearing Testimony***

During the April 30, 2012 hearing, Williams testified as follows:

- She is unmarried and has no children.  She lives in a house with a roommate. (Tr. 33.)

- She completed the eighth grade.  She was in learning disabled classes because of her ADHD.  She can read and write "okay."  (Tr. 34.)

- She cannot work because of her headaches. She gets them "a couple of times a day." They generally last from one to three hours.  When she gets a headache, the whole right side of her head hurts and her right eye swells shut.  All of her headaches have the same level of severity.  They feel "almost like a dying pain," like the pain is "going to shut [her] brain down."  (Tr. 35, 37-39.)

- After the pain subsides, her eye continues to be swollen shut.  It sometimes takes until the next day for the swelling to go down, but then she gets another headache so it seems as if the swelling "never actually goes away."  (Tr. 39.)  She has trouble seeing things when her eye swells and "runs into stuff."  (Tr. 48.)

- She can feel a headache coming on because her eye starts to water excessively and swells shut.  She feels hot and nauseous.  She has to take her clothes off and lie down in the dark.  (Tr. 37-38.)

- On a "lucky day," she will get only one headache.  (Tr. 37.)  This happens approximately twice per week.  (Tr. 48.)   It has been several years since she has

7

had a day without a headache.  (Tr. 41.)

- She is not sure what causes her headaches.  They come at different times of the day and night.  She cannot do anything when she is experiencing a headache.  She cannot talk to anyone and people cannot talk to her.  (Tr. 49.)

- Before she got her medical card, she went to the emergency room often for her headaches.  (Tr. 50.)  She has tried many different kinds of medication for her headaches.  They "took the edge off." (Tr. 47.)  She does not take prescription medication anymore because "they took her medical card" and she cannot get any refills.  (Tr. 36-37.)  Her family doctor recently referred her to a neurologist.  (Tr. 50-51.)  She saw a psychiatrist for her ADHD when she was a child but has not seen one since. (Tr. 35-36.)

- She does not take any over-the-counter medication because it does not help.  (Tr. 37.)  She just goes to bed until the headache goes away.  (Tr. 40.)

- She feels "nervous all the time" waiting for a headache to happen.  She feels like she cannot go anywhere because she is worried about "when it's going to hit me again." (Tr. 36.)  Her headaches also affect her memory.  She feels "confused all the time." (Tr. 41.)

- She has not worked anywhere since she began experiencing headaches.  Her headaches started when she was 20 or 21 years old.  (Tr. 47.)

- On an average day, she sits in her room, watches television, and waits for a headache to happen.  (Tr. 41.)  She bathes every two to three days and microwaves her own meals.  She does her own laundry and picks up after herself.  (Tr. 42-43.)  She does not go outside at all because the sun makes her eyes water.  She does not go out after dark either.  (Tr. 43.)

- She does not have a computer or access to the internet.  She "doesn't really know anybody anymore" and does not have any friends.  (Tr. 43-44, 46.)  She does not go to church or to the movies.  (Tr. 44, 46.)  Although she does not see people very often, she "get[s] along with people." (Tr. 41.)

- She has never had a driver's license.  (Tr. 34.)  Her mother comes to see her and takes her places.  Her mother sometimes takes her to the grocery store and shopping at the Goodwill store, but they often have to leave early because of a headache.  Twice a week, she goes to her mother's house to visit for an hour or so.  (Tr. 44-47.)

The ALJ determined Williams had no past relevant work experience.  (Tr. 52.)  He then posed the following hypothetical question to the VE:

I'd like you to assume an individual of the claimant's age, with no past work experience, and education.  Assume that the individual was capable of work at all exertional levels, but would – but would be limited to the performance of unskilled, simple, repetitive tasks, with no strict production demands; superficial interaction with co-workers and the general public; and, a static work environment with minimal changes in routine.

(Tr. 52-53.)  The VE testified such a hypothetical individual would be able to perform the

following jobs at the light exertional level: light inspection jobs; light cleaning jobs; and, labeler/marker in a retail store.  (Tr. 53.)

The ALJ then posed a second hypothetical which was the same as the first, but added the limitation that the individual might be absent from work, either partially or entirely, for three to five days per month "because of an exacerbation of symptoms."  (Tr. 54.)  The VE testified that "absenteeism at that level . . . would preclude any competitive employment."  (Tr. 54.)

### III.  Standard for Disability

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV.  Summary of Commissioner's Decision

The ALJ found Williams established medically determinable, severe impairments, due to history of mastoiditis, headaches, and anxiety disorder; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 12-15.)  Williams was found to have no past relevant work and was determined to have a Residual Functional Capacity ("RFC") for a full range of work at all exertional levels but

with certain non-exertional limitations.  (Tr. 15-17.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Williams was not disabled.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

10

supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### *Credibility*

Williams argues the ALJ erred in finding her to be less than fully credible.  She maintains the ALJ's "ignorance" regarding the nature of her cluster headaches caused him to improperly find no evidence of neurological deficits substantiating her subjective complaints.  Along a similar vein, Williams asserts the ALJ's finding that she had been "inconsistent regarding the frequency and severity of her headaches" reflects a fundamental misunderstanding of her impairment.  She also complains the ALJ improperly equated her "sporadic" activities of daily living with proof of an ability to work on a continuing basis.  Finally, Williams claims the ALJ unfairly considered her lack of treatment and work history in evaluating her credibility.

The Commissioner argues the ALJ properly considered the lack of objective medical evidence substantiating Williams' self-reports of disabling pain; Williams' ability to perform a "wide range of daily activities;" Williams' contradictory statements regarding the frequency and severity of her headaches; and, the lack of any relevant work history.  The Commissioner further argues that the decision's credibility analysis "amply satisfied" the ALJ's duty to articulate reasons for finding Williams' subjective complaints to be less than fully credible.

11

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  SSR 96-7p.  Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record.  *Id.*  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96-7p, Purpose section; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").  To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* SSR 96–7p, Purpose.  Beyond medical evidence, there are

12

seven factors that the ALJ should consider.[3]  The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross*, 373 F.Supp.2d at 733; *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ discussed the medical evidence and hearing testimony regarding Williams' impairments.  (Tr. 12-16.)  He accepted that Williams' mastoiditis, headaches, and anxiety disorder constituted severe impairments, and found they could reasonably be expected to cause her alleged symptoms.  (Tr. 12, 16.)  However, the ALJ dismissed Williams' statements concerning the intensity, persistence, and limiting effects of her symptoms as not credible to the extent they were inconsistent with the RFC.  (Tr. 16.)  He evaluated her credibility as follows:

> The record as a whole does not substantiate the claimant's allegation of a disabling impairment or combination of impairments. As previously discussed, the objective medical evidence does not indicate the presence of an impairment or combination of impairments capable of producing severe, intractable levels of pain, fatigue, or other symptoms that would preclude all work activity.  As summarized above, although the claimant reports frequent headaches, none of her physicians have witnessed any of these headaches, and the claimant has been described as pleasant and in no acute distress.  There are also no neurological deficits.
>
> Furthermore, the claimant has not had headaches so severe as to seek emergency room treatment.  She says she gets severe headaches one to two times per day that last one to three hours.  She takes no medications for relief, sometimes using a cold cloth, and she vomits every time after which she feels better.  However, there is no proof of this.  While the medical evidence supports treatment for headaches, nothing documents frequency or severity testified to since the last treatment two months after filing her application.  The claimant was also somewhat contradictory in testimony, saying she stays in her room all day long waiting for headaches to happen.  Yet later she testified that she goes to her mother's house a couple of times a week and stays for one to two hours.  And occasionally her

---

[3]    The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96–7p, Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732-733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

mother will take her shopping.

Additionally, other than the psychological consultative examination (4F), there is no evidence of a mental impairment. The claimant has not sought treatment and denies problems. However, a medically determinable impairment of anxiety with social limits is included to give her every benefit of the doubt.

The claimant has also been inconsistent regarding the frequency and severity of her headaches. In March 2009, Dr. Kellum noted that her headaches "have responded rather nicely to Nortriptyline . . ." In April 2009 he stated that "She is doing pretty well from the stand point of her headaches. . ." She was also doing "pretty well" in December 2009 and on February 26, 2010 reported no headaches since December 2009 (Exhibit 1F). Yet on July 13, 2011, she stated that "none of her medication ever helped anyway" (Exhibit 8F, p. 2).

On June 10, 2010, she complained about headaches, but on July 6, 2010, she had no complaints (Exhibit 2F, pp. 3-4). Yet when she saw Dr. Kellum in July 2010 she reported having four a day (Exhibit 3F). On October 7, 2010, the claimant stated she was having headaches three to four times a day (Exhibit 8F, p. 1). Then on October 20, 2010, the claimant stated that she had severe headaches three to four times nightly and a couple of times daily (Exhibit 4E). On November 16, 2010, she was having headaches but with some improvement (Exhibit 3F). In January 2011 she began to have five to six headaches a day, lasting up to two hours a day (Exhibit 10E). But on March 1, 2011, she was again having her headaches three to four times nightly and a couple of times daily (Exhibit 8E).

Yet she testified that on a good day, and with no medication, she will get only one headache. However, in his opinion, Dr. Kellum stated that the claimant's headaches were lasting 17 to 24 hours (Exhibit 7F). But if they were indeed lasting this long, then how could the claimant visit with her mother, go shopping, be intimate with her boyfriend, etc.

And the claimant has no relevant work history, even prior to the appearance of her headaches. This lack of a work history is indicative of either a poor work ethic or reasons other than her impairments for not working.

These inconsistencies within the documentary record and the claimant's testimony diminish her credibility and do not support a further reduction of the established residual functional capacity. Therefore, the claimant retains the residual functional capacity as previously established.

(Tr. 16-17.)

Williams first argues the ALJ's credibility analysis is flawed because he erroneously concluded the medical evidence showed "no neurological deficits." Citing the Mayo Clinic website's discussion of cluster headaches, Williams argues "[n]eurological findings associated with cluster headaches may include a smaller pupil or a drooping eyelid." (Doc. No. 14 at 16-17.) She maintains "[t]he ALJ omits the well-documented clinical finding associated with her headaches: right eyelid swelling," noting that "this observation was made by treating and

14

examining physicians." *Id*. at 17.

The Court rejects this argument.  The ALJ acknowledged Williams' testimony that her eyes watered and swelled during headaches.  (Tr. 16.)  He also recognized evidence indicating Williams was occasionally observed to have right eyelid swelling during medical appointments.  (Tr. 13.)  However, the ALJ also observed that Williams' visual acuity was generally reported to be normal; no other neurological abnormalities were noted; and, she was frequently described by her physicians as alert, oriented, and in no acute distress.  (Tr. 13, 16.)  Williams does not dispute this characterization of the medical record, nor does she direct this Court's attention to any treatment notes documenting abnormal neurological examination findings other than her occasional right eye swelling.  Moreover, upon its own review of the record, the Court notes Dr. Kellum and Dr. Schuler conducted neurological examinations of Williams on several occasions and consistently reported normal findings.  (Tr. 200, 211, 256.)  Thus, even if Williams' right eyelid swelling were considered a neurological deficit, the Court finds the ALJ did not err in light of Williams' normal neurological examinations and the overall lack of objective medical evidence showing neurological abnormalities consistent with cluster headaches.[4]

Williams next objects to the ALJ's finding that she lacked credibility because of her inconsistent statements regarding the frequency and severity of her headaches.  Again relying on the Mayo Clinic website's description of cluster headaches symptoms, Williams maintains "[t]his can only be explained by the ALJ's ignorance of cluster headaches and the variability in their occurrence."  (Doc. No. 14 at 17.)  She argues it is typical for cluster headaches to be episodic in nature and insists that "what the ALJ calls an 'inconsistency' is actually the nature of the impairment."  *Id*. at 18.

---

[4]  The ALJ recognized that a January 2008 MRI of Williams' brain "demonstrated chronic mastoiditis but no intracranial changes."  (Tr. 12.)  He also found that Williams' "history of mastoiditis" constituted a severe impairment.  *Id.*  Mastoiditis is usually caused by a middle ear infection that may spread from the ear to the mastoid bone of the skull.  Symptoms include ear pain or swelling; drainage from the ear; fever; headache; and, hearing loss.  *See e.g.* http://www.nlm.nih.gov/medlineplus/ency/article/001034.htm. Williams does not argue that her chronic mastoiditis (or any of her symptoms relating thereto) constitute "neurological deficits" associated with her cluster headaches.

The Court finds this argument to be without merit.  The ALJ thoroughly and accurately summarized Williams' varying reports regarding the frequency of her headaches and the effectiveness of her medications.  (Tr. 17.)  He noted that, although Williams reported doing well on medication in March, April and December 2009, she later complained that "none of her medications ever helped anyway."  *Id*.  The ALJ also observed that, on July 2, 2010, Williams reported to Dr. Kellum that she was experiencing four headaches a day; however, she presented to Dr. Schuler just four days later and did not voice any concerns or complaints regarding headaches.  *Id*.  Finally, the ALJ noted that, throughout 2010 and early 2011, Williams reported experiencing between three and six headaches each day.  *Id*.  However, Williams testified during the hearing that "on a good day, with no medication, she will only get one headache."  *Id*.  Williams' arguments notwithstanding, the Court finds these contradictory statements are not simply reflections of the allegedly variable nature of cluster headaches.  Rather, they are internally inconsistent reports regarding the frequency and severity of Williams' symptoms, as well as the effectiveness of the medications used to treat them.  The ALJ's reliance on Williams' inconsistent statements was, thus, not indicative of his ignorance or misunderstanding of her impairment.  To the contrary, the Court finds the ALJ properly found Williams' credibility was undermined by the fact that she repeatedly and directly contradicted herself in reporting her symptoms to her treating physicians.  *See* Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 at *5 (July 2, 1996) (noting that, in assessing credibility, an ALJ should consider "the consistency of the individual's own statements").

The Court also rejects Williams' perfunctory argument that the ALJ "improperly equates transient and sporadic activity as proof of [her] ability to work on a regular and continuous basis." (Doc. No. 14 at 19.)  The only mention of Williams' daily activities in the context of the decision's credibility analysis is the ALJ's finding that Williams "was also somewhat contradictory in testimony, saying she stays in her room all day long waiting for headaches to happen. Yet later she testified that she goes to her mother's house a couple of times a week and stays for one to two hours . . . [a]nd occasionally her mother will take her shopping." (Tr. 16-17.) Williams fails to articulate how this observation is inaccurate.  Nor does she offer any meaningful

16

argument to support her assertion that the ALJ erred in considering this issue in determining her credibility.  Indeed, SSR 96-7p specifically provides that, in addition to the objective medical evidence, an ALJ should consider a claimant's daily activities in assessing his or her credibility.  *See* SSR 96-7p, 1996 WL 374186 at * 3 (July 2, 1996).  Accordingly, to the extent the ALJ considered Williams' daily activities in his credibility analysis, the Court finds he did not err in doing so.

Williams next argues the ALJ improperly relied on her alleged "'lack of treatment' as a basis to discredit Plaintiff without acknowledging or accounting for the fact that she has not always had medical insurance." (Doc. No. 14 at 20.)  She maintains, that pursuant to SSR 82-59, 1982 WL 31384 (1982), the ALJ was required to consider if a claimant has an acceptable reason for not following prescribed treatment.  Williams maintains the ALJ's credibility determination is flawed because he failed to "examine[] whether Plaintiff understood the nature of her treatment in relation to her disability claim, and further inquire[] into her reasons for failing to adhere to further follow-up with Dr. Kellum."  *Id.* at 21.

The Court rejects this argument.  SSR 82-59 is not applicable to the instant case.  As another district court within this Circuit recently explained:

> Social Security Ruling 82–59, codified at 20 CFR § 404.1530, provides that a claimant who is found to have a disability under the five-step analysis above, but who does not follow treatment prescribed by his or her physician that can restore her ability to work, must have a good reason for not following that treatment in order to be found disabled:
>
>> An individual who *would otherwise be found to be under a disability*, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot be [sic] virtue of such "failure" be found to be under a disability.
>
> SSR 82–59, 45 Fed.Reg. 55566 (Aug. 20, 1980) (emphasis added).
>
> However, "[f]ailure to follow prescribed treatment becomes a determinative issue only if the claimant's impairment is found to be disabling under steps one through five and is amenable to treatment expected to restore her ability to work." *Hester v. Sec'y of Health & Hum. Servs.*, 886 F.2d 1315, 1989 WL 115632, *3 (6th Cir.1989); *see also* 20 C.F.R. §§ 404.1530, 416.930 (2012).  In other words, "Social Security Ruling 82–59 only applies to claimants who would otherwise be disabled within the meaning of the Act; it does not restrict the use of evidence of

17

noncompliance for the disability hearing."  *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir.2001).

*Ranellucci v. Astrue*, 2012 WL 4484922 at * 10 (M.D.Tenn. Sept. 27, 2012).  Courts in this Circuit have found SSR 82-59 inapplicable "in cases where the ALJ has considered the noncompliance as only one factor is assessing a claimant's credibility or in cases where no prior disability ruling was made by an ALJ that was thereafter undone by a claimant's noncompliance with treatment recommendations."  *Kinter v. Colvin*, 2013 WL 1878883 at * 9 (N.D. Ohio April 18, 2013) (collecting cases).  *See also Bozarth v. Astrue*, 2013 WL 456483, at * 15 (M.D.Tenn., Feb. 2013) ("[a] precondition to the applicability of SSR 82–59 is that the ALJ determine that the plaintiff was disabled. The ALJ did not determine that the plaintiff was disabled. Therefore, SSR 82–59 is inapposite to the facts of this case."); *Kays v. Astrue*, 2013 WL 504158, at *12 (N.D. Ohio, Jan. 16, 2013) (SSR 82–59 inapplicable where there was no prior ALJ finding that claimant was disabled but would not have been disabled had he followed treatment recommendations), *report and recommendation adopted by* 2013 WL 489684 (N.D.Ohio, Feb.8, 2013); *Baker v. Astrue*, 2010 WL 1818045 at * 5 (S.D. Ohio April 15, 2010) ("Finding that a claimant has a disabling impairment is the necessary trigger for an analysis under SSR 82-59.  Because the Commissioner failed to find that Plaintiff was disabled, he was not required to analyze Plaintiff's non-compliance pursuant to SSR 82-59").

Here, the ALJ did not find that Williams was disabled under steps one through five of the sequential analysis, and her ability to return to work could be restored by a course of treatment recommended by her treating physician.  Thus, SSR 82-59 is not applicable and the ALJ was not required under that Ruling to examine Williams' reasons for any failure on her part to obtain treatment.  Nor was the ALJ required to question Williams regarding whether she "understood the nature of her treatment in relation to her disability claim," as argued in Williams' brief.  (Doc. No. 14 at 21.)

That being said, the Court notes Williams did testify at the hearing that she was unable to continue treatment with Dr. Kellum or obtain medication refills due to her loss of insurance.  (Tr. 36-37.)  The ALJ expressly recognized this testimony in the decision, noting Williams "stated due

18

to financial problems she could no longer see Dr. Kellum and had not been taking medications." (Tr. 13.)  As noted above, courts have found an ALJ may consider non-compliance as one factor in assessing a claimant's credibility.  *See e.g. Rannellucci*, 2012 WL 4484922 at * 10; *Kinter*, 2013 WL 1878883 at * 9.  To the extent the ALJ herein considered Williams' lack of treatment in assessing her credibility, the Court finds no error in doing so.  As noted above, the ALJ considered a number of factors in his credibility analysis.  It was not error to include Williams' non-compliance as one of factor in the overall determination of her credibility.

Finally, Williams argues the ALJ improperly relied on her lack of work history to "discredit her."  (Doc. No. 14 at 21.)  Specifically, she claims the ALJ erred in failing to "consider the fact that she has an 8th grade [education], special education classes, and that she consistently stated in the record that her headaches started in 2003, when she was 21 years of age." (Doc. No. 14 at 22.)  The Court finds no error in considering Williams' lack of work history as part of the credibility determination.  Both the regulations and SSR 96-7p specifically state an ALJ may consider a claimant's prior work record as one factor in assessing credibility.  *See* 20 CFR § 416.929(c)(3) (providing that, in assessing the intensity and persistence of a claimant's symptoms, "[w]e will consider all of the evidence presented, including information about your prior work record . . . "); SSR 96-7p, 1996 WL 374186 at * 5 (in assessing the credibility of an individual's statements about pain or other symptoms, the adjudicator should consider statements about the individual's "prior work record and efforts to work").  *See also Barney v. Comm'r of Soc. Sec.*, 2010 WL 1027877 at * 4 (W.D. Mich. 2010) (noting an ALJ may consider a claimant's work history in assessing credibility).  Here, the ALJ properly considered, as one of many factors in his overall credibility analysis, the fact that Williams failed to present evidence of any meaningful work attempts prior to the appearance of her headaches.  (Tr. 17.)  Although Williams testified her headaches began at the age of 20 or 21, the Court finds it was not improper for the ALJ to consider the absence of any meaningful work history prior to that time as part of his

19

overall credibility assessment.[5]

Accordingly, the Court finds the ALJ did not improperly assess Williams' credibility.  The decision provides a number of specific reasons for finding Williams to be less than fully credible.  (Tr. 16-17.)  Moreover, in reaching his credibility determination, the ALJ considered virtually all of the factors set forth in SSR 96-7p, including Williams' testimony regarding her daily activities; the location, duration, frequency and intensity of her headache pain; the type, dosage, and effectiveness of medication taken to alleviate her symptoms; and, measures other than treatment that Williams has used to relieve her pain.  (Tr. 16-17.)

Although Williams believes the reasons given by the ALJ do not demonstrate a lack of credibility, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is *not* the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")  The ALJ provided sufficiently specific reasons for his credibility determination and supported those reasons with reference to specific evidence in the record.  Thus, the Court finds this assignment of error is without merit.

### *Evaluation of the Opinion Evidence*

---

[5]  Williams also claims that, because she is applying only for SSI, "the period under consideration is from the date of the application [i.e. September 2010] forward." (Doc. No. 14 at 22.) She maintains that, since she "was under no obligation to establish her disability before the date she applied for SSI, it is manifestly unfair for the ALJ to draw the most unfavorable conclusion from the lack of evidence of her disability from 2003 to 2010." *Id*.  Williams does not cite any supporting legal authority.  In the absence of any meaningful development of this argument, and in light of the fact that SSR 96-7p requires an ALJ to determine credibility based on the entire case record, the Court finds Williams has failed to establish that the ALJ erred in considering information regarding Williams' work history (or lack thereof) prior to September 2010.  *See* SSR 96-7p, 1996 WL 374186 at * 4 ("If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record.").

Williams next argues the ALJ failed to properly evaluate the medical opinions offered by treating physician Kellum and consultative examiner McIntire.  She maintains the ALJ erred in rejecting these opinions on the grounds they were based on Williams' allegedly inconsistent statements regarding the frequency and severity of her headaches.  Moreover, Williams voices particular objection to the ALJ's rejection of Dr. McIntire's opinions because his use of the term "markedly impaired" was "nebulous."  (Doc. No. 14 at 10-14.)  The Commissioner argues substantial evidence supports the ALJ's decision to assign little weight to these opinions.

### *Treating Physician Dr. Kellum*

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6ᵗʰ Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6ᵗʰ Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[6]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

---

[6]  Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

21

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

22

Here, the ALJ discussed the opinions of Dr. Kellum as follows:

> On February 1, 2011, Dr. Kellum, the claimant's treating neurologist, opined that the claimant is capable of low stress jobs, but she would be absent from work four or more times per month, and her symptoms would interfere with her ability to maintain persistence and pace in a competitive employment (Exhibit 7F). I agree with Dr. Kellum's assessment that the claimant is capable of low stress work (although a vague statement, it is consistent with the residual functional capacity for simple, repetitive tasks). However, I cannot give weight to his other statements. First, Dr. Kellum last treated the claimant in November 2010 and he appears to have based his opinion in large part on the claimant's assertion regarding the frequency and severity of her headaches. However, the inconsistencies in her assertions regarding frequency will be described in more detail below. For these reasons, I cannot give controlling weight to the treating source opinion.

(Tr. 15.) The ALJ formulated the RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: no greater than simple, repetitive tasks with no strict production demands, only superficial interaction with co-workers and the general public, and only a static environment with minimal changes in routine.

(Tr. 15.)

The Court finds substantial evidence supports the ALJ's rejection of Dr. Kellum's opinions regarding Williams' predicted absenteeism and inability to maintain persistence and pace. The ALJ explained he could not assign controlling weight to these opinions because they were based in large part on Williams' inconsistent statements regarding the frequency and severity of her headaches. As discussed above, the ALJ accurately summarized Williams' varying reports regarding the frequency and severity of her headaches; and properly found Williams' credibility to be undermined by her contradictory self-reporting to treating physicians on this issue. Courts have held that "[w]hen a treating physician's opinion is based on a claimant's self reports which are themselves not credible, it is not error to assign little weight to the opinion." *Webb v. Comm'r of Soc. Sec.*, 2014 WL 129237 at * 6 (E.D. Tenn. Jan. 14, 2014) (citing *Vorholt v. Comm'r of Soc. Sec.,* 409 Fed App'x 883, 889 (6th Cir. 2011)). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (affirming ALJ's rejection of treating physician opinions where "[t]hese doctors formed their opinions solely from Smith's reporting of her symptoms and her conditions and the ALJ found that Smith was not credible"); *Stevenson v.*

23

*Astrue*, 2010 WL 3034018 at * 8 (M.D. Tenn. Aug. 3, 2010) (finding that a medical opinion "based on [an] incredible self-report could reasonably be given insignificant weight by an ALJ when the credibility determination is based on substantial evidence").

Based on the above, the Court finds the ALJ sufficiently articulated good reasons for rejecting Dr. Kellum's opinions regarding Williams' predicted absenteeism and persistence and pace limitations.  The Court further finds the ALJ's decision to reject these opinions is supported by substantial evidence in the record.  Accordingly, Williams' argument that the ALJ violated the treating physician rule in his consideration of Dr. Kellum's opinions is without merit.

### Consultative Examiner Dr. McIntire

Williams also argues the ALJ erred in rejecting consultative examiner Dr. McIntire's opinions regarding Williams' marked limitations.  As noted above, Dr. McIntire reviewed Williams' records, conducted a clinical interview, and prepared a psychological evaluation for the Bureau of Disability Determination.  (Tr. 231.)  The ALJ discussed Dr. McIntire's opinion as follows:

> Dr. McIntire opined that the claimant was "markedly impaired" in her ability to relate to others, in her ability to maintain attention and concentration to perform tasks, and in her ability to manage the emotional stress of everyday work.  He further stated that the claimant was "unimpaired" in her ability to understand, remember, and follow simple one or two step instructions (Exhibit 4F, pp. 5-6).  I cannot give much weight to Dr. McIntire's opinion.  First, "markedly impaired" is a nebulous term, and Dr. McIntire did not define what that term means.  And second, he appears to have based his opinion on the claimant's assertions, and again, her assertions are not entirely credible.

(Tr. 15.)

Williams argues the ALJ improperly rejected Dr. McIntire's opinions because he found the term "markedly impaired" to be nebulous, noting that "Dr. McIntire was SSA's own doctor using SSA's own forms, answering SSA's own questions, one of which was to assess a variety of work-related functions using SSA's own terms," including the term "marked."  (Doc. No. 14 at 13.)  She also maintains that, if the ALJ was uncertain regarding Dr. McIntire's opinion, he was required to recontact Dr. McIntire for an explanation.  *Id*.

Pursuant to the regulations, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 C.F.R.

24

§ 404.1527(e)(2)(i).  Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions.  *Id.*  When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist." *Id.*

Here, the ALJ acknowledged Dr. McIntire's opinions and explained he could not give them "much weight."  (Tr. 15.)  While the Court does find it puzzling that the ALJ questioned Dr. McIntire's opinions because he found the use of the term "markedly impaired" to be "nebulous," the Court finds this is not the only reason the ALJ provided for rejecting Dr. McIntire's assessment.  As the Commissioner correctly notes, the ALJ also explained that he discounted Dr. McIntire's opinions because they were based on "the claimant's assertions, and again, her assertions are not entirely credible."  (Tr. 15.)  As discussed above, the ALJ properly determined Williams lacked credibility based, in part, on her inconsistent statements regarding the frequency and severity of her headaches.  Thus, the Court finds the ALJ appropriately discounted Dr. McIntire's opinions on this basis.  *See Smith,* 482 F.3d at 876; *Webb*, 2014 WL 129237 at * 6; *Stevenson,* 2010 WL 3034018 at * 8.  Moreover, as this was a valid and independent basis for rejecting Dr. McIntire's assessment, the Court finds the ALJ was not under a duty to recontact him to obtain clarification regarding his use of the term "markedly impaired."

Accordingly, the Court finds the ALJ's decision to accord little weight to Dr. McIntire's opinion is supported by substantial evidence in the record.  This assignment of error is without merit.

### RFC Assessment

Finally, Williams argues the RFC is not supported by substantial evidence because it

"does not even arguably include any headache related limitation whatsoever, such as her difficulty concentrating or maintaining pace while experiencing a cluster headache, or missing days of work altogether due to cluster headaches." (Doc No. 14 at 24.)  She also argues the ALJ erred when he failed to include such limitations in the hypothetical posed to the VE.  *Id.*

The Commissioner argues the ALJ did, in fact, properly accommodate functional limitations resulting from Williams' headaches, noting the RFC limits Williams to simple, repetitive work with no strict production demands, only superficial interaction with co-workers and the general public, and only a static environment with minimal changes in routine. (Doc. No. 15 at 7.)  She also argues that all credibly established limitations were included in the hypothetical.  *Id.* at 16.

A claimant's RFC is the most that he can still do despite his functional limitations.  20 C.F.R. § 404.154(a); SSR 96-8p.  The assessment must be based upon all of the relevant evidence, including the medical records and medical source opinions.  20 C.F.R. § 404.1546(c).  The final responsibility for deciding the RFC "is reserved to the Commissioner."  20 C.F.R. § 404.1527(e)(2).  While this Court reviews the entire administrative record, it "does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."  *Reynolds,* 2011 WL 1228165 at * 2.  *See also Vance,* 2008 WL 162942 at * 6.  Indeed, the Sixth Circuit has repeatedly upheld ALJ decisions where medical opinion testimony was rejected and the RFC was determined based upon objective medical and non-medical evidence.  *See e.g., Ford v. Comm'r of Soc. Sec.*, 2004 WL 2567650 (6th Cir. Nov. 10, 2004); *Poe v. Comm'r of Soc. Sec.*, 2009 WL 2514058 (6th Cir. Aug. 18, 2009).  "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe*, 2009 WL 2514058 at * 7.

The ALJ thoroughly discussed the medical and opinion evidence regarding Williams' headaches.  (Tr. 12-13, 15-17.)  The decision also recounted Williams' hearing testimony regarding her headache symptoms and their effect on her ability to work.  (Tr. 16.)  After consideration of this evidence, the ALJ found Williams retained the RFC to "perform a full

26

range of work at all exertional levels but with the following non-exertional limitations: no greater than simple, repetitive tasks with no strict production demands, only superficial interaction with co-workers and the general public, and only a static environment with minimal changes in routine." (Tr. 15.)  The decision then stated this RFC "accepts and adopts the opinion of State agency psychologists" Dr. Tishler and Dr. Waggoner, noting that "[t]hese opinions are well supported by the evidence in the record that shows that the claimant can perform routine, daily activities, relate to her treating and examining physicians, was able to give a coherent personal history at the consultative examination, and had no difficulties at the hearing."(Tr. 15.)

   The Court rejects Williams' argument that the RFC fails to account for her headaches by not including "difficulty concentrating or maintaining pace."  (Doc. No. 14 at 24.)  The RFC expressly limits Williams to "simple, repetitive tasks with no strict production demands" and "only a static environment with minimal changes in routine."  (Tr. 15.)  Williams does not explain how these restrictions (all of which were included in the hypothetical) fail to account for her concentration, persistence, or pace-related functional limitations.  (Tr. 52-53.)  Moreover, she does not identify any additional restrictions she believes should have been included in the RFC to address her headache-related limitations, with the exception of Dr. Kellum's opinion that she would miss four or more days of work per month due to symptoms related to her impairments.  (Doc. No. 17 at 4.)  However, the Court has already found the ALJ properly rejected Dr. Kellum's finding regarding Williams' predicted absenteeism.  Thus, the ALJ was not required to incorporate it into the hypothetical posed to the VE.  *See Griffith v. Comm'r of Soc. Sec.,* 217 Fed. Appx. 425, 429 (6th Cir. 2007) (finding that, in fashioning a hypothetical question, the ALJ is required to incorporate only those limitations that he accepts as credible); *Mueller v. Colvin*, 2013 WL 4427450 at * 9 (N.D. Ohio Aug. 15, 2013) (same).  Finally, the Court notes Williams does not contest the ALJ's finding that the RFC is consistent with the opinions of state agency psychologists Tishler and Waggoner.  (Tr. 15, 63-65, 77-79.)

   Accordingly, the Court finds the RFC reasonably accounts for Williams' headaches and is supported by substantial evidence.  This assignment of error is without merit.

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision of the Commissioner should be AFFIRMED.


s/ Greg White
United States Magistrate Judge

Date: March 19, 2014


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

28